

1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101-3301
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5  darrenr@rgrdlaw.com
   davew@rgrdlaw.com
6
   Attorneys for Plaintiff
7
   [Additional counsel appear on signature page.]
8
                UNITED STATES DISTRICT COURT
9
              CENTRAL DISTRICT OF CALIFORNIA
10
                     WESTERN DIVISION
11
12  JUSTIN MUI, Individually and on        )   VIA FAX
    Behalf of All Others Similarly Situated, )
13                                          )   No. CV11 0929 GAF SSx
                         Plaintiff,         )
14                                          )   CLASS ACTION
       vs.                                  )
15                                          )   COMPLAINT FOR VIOLATION OF
    MANNKIND CORPORATION,                   )   THE FEDERAL SECURITIES LAWS
16  ALFRED E. MANN, HAKAN S.                )
    EDSTROM, MATTHEW J. PFEFFER             )
17  and PETER C. RICHARDSON,                )
                                            )
18                       Defendants.        )   DEMAND FOR JURY TRIAL
                                            )
19
20
21
22
23
24
25
26
27
28

**JURISDICTION AND VENUE**

1. Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "1934 Act"). The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

2. Venue is proper in this district pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this district.

3. MannKind Corporation ("MannKind" or the "Company") maintains its principal executive offices at 28903 North Avenue Paine, Valencia, California. Certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.

4. In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**INTRODUCTION**

5. This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of MannKind between June 25, 2010 and January 19, 2011, inclusive (the "Class Period"), against MannKind and certain of its officers and/or directors for violations of the 1934 Act.

6. MannKind is a biopharmaceutical company focused on the discovery, development and commercialization of therapeutic products for diseases, such as diabetes and cancer. The Company's stock traded largely on the prospects of its lead product candidate, AFREZZA® (insulin human [rDNA origin]) Inhalation Powder ("AFREZZA") for the treatment of adult patients with Type 1 and Type 2 diabetes for the control of hyperglycemia, a rapid-acting insulin that had completed clinical trials in the United States, Europe, and Japan. AFREZZA utilizes Technosphere formulation technology, which is based on a class of organic molecules that are

designed to self-assemble into small particles onto which drug molecules can be loaded. With AFREZZA, the Company loads recombinant human insulin onto the Technosphere particles.

7.      Prior to the Class Period, the U.S. Food and Drug Administration (the "FDA") had delayed approval of AFREZZA. MannKind represented that the delay was due to the FDA's mistake in not completing an inspection of the European facility that makes the insulin used in AFREZZA. In fact, there were questions about the clinical utility of AFREZZA.

8.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and prospects for AFREZZA. Specifically, defendants continuously hyped AFREZZA for the treatment of adult patients with Type 1 and Type 2 diabetes for the control of hyperglycemia, telling market observers that AFREZZA was one of the most valuable products in the history of drug making, while failing to disclose that MannKind's platform would require better information for patients about the risks of AFREZZA. As a result of defendants' false statements, MannKind's stock traded at artificially inflated prices during the Class Period, reaching a high of $9.83 per share on January 18, 2011.

9.      Then, on January 19, 2011, shortly before the market closed, MannKind issued a press release announcing that the Company had received a complete response letter from the FDA pertaining to the Company's New Drug Application ("NDA") for AFREZZA. The FDA deferred approving AFREZZA and requested two additional clinical trials with the inhaler.

10.      Prior to this news being released on January 19, 2011, MannKind's stock began dropping as news of the FDA deferral leaked into the market. In fact, the FDA notice had been received on January 18, 2011, and defendants had held off informing shareholders. Trading was halted in MannKind stock on January 19, 2011, and when trading resumed the next day, MannKind's stock plunged $2.94 per share to close at

1  $6.17 per share on January 20, 2011, a one-day decline of 32% on volume of over 34

2  million shares.

3       11.    The true facts, which were known by the defendants but concealed from

4  the investing public during the Class Period, were as follows:

5           (a)    The Company failed to disclose that the FDA had issues with the

6  clinical utility of AFREZZA which might inhibit approval;

7           (b)    AFREZZA was a riskier product than investors were led to believe

8  and would require additional risk disclosure to patients if approved;

9           (c)    The reasons for the FDA's earlier delay in approval were not

10 limited to the inspection of the European facility; and

11          (d)    Given these factors, defendants knew it was highly doubtful that

12 FDA approval would be forthcoming.

13      12.    As a result of defendants' false statements, MannKind's stock traded at

14 inflated levels during the Class Period.  However, after the above revelations seeped

15 into the market, the Company's shares were hammered by massive sales, sending

16 them down over 37% from their Class Period high.

17                            **PARTIES**

18      13.    Plaintiff Justin Mui purchased MannKind common stock during the Class

19 Period as set forth in the certification attached hereto and was damaged as the result of

20 defendants' wrongdoing as alleged in this complaint.

21      14.    Defendant MannKind is a biopharmaceutical company that focuses on

22 the discovery, development and commercialization of therapeutic products for patients

23 with diseases such as diabetes and cancer.

24      15.    Defendant Alfred E. Mann ("Mann") founded MannKind and at all

25 relevant times has been the Company's Chairman of the Board and Chief Executive

26 Officer ("CEO").

27      16.    Defendant Hakan S. Edstrom ("Edstrom") is, and at all relevant times has

28 been, the Company's President, Chief Operating Officer ("COO") and a director.

- 3 -

17.    Defendant Matthew J. Pfeffer ("Pfeffer") is, and at all relevant times has been, the Company's Chief Financial Officer ("CFO") and Corporate Vice President. On January 18, 2011, the same day MannKind received the FDA notice, but the day before MannKind released this news to its shareholders, Pfeffer sold 6,300 shares of his MannKind stock.

18.    Defendant Peter C. Richardson ("Richardson") is, and at all relevant times has been, the Company's Corporate Vice President and Chief Scientific Officer.

19.    The defendants referenced above in ¶¶15-18 are referred to herein as the "Individual Defendants."

20.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MannKind's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

21.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about MannKind.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MannKind common stock was a success, as it: (i) deceived the investing public regarding MannKind's prospects and business; (ii) artificially inflated the price of MannKind common stock; (iii) allowed defendant Pfeffer to sell 6,300 shares of his

1  own MannKind common stock at an artificially inflated price; and (iv) caused plaintiff

2  and other members of the Class to purchase MannKind common stock at inflated

3  prices.

4  **BACKGROUND**

5  22.  MannKind is a biopharmaceutical company focused on the discovery,

6  development and commercialization of therapeutic products for diseases, such as

7  diabetes and cancer.  The Company's stock traded largely on the prospects of its lead

8  product candidate, AFREZZA (insulin human [rDNA origin]) Inhalation Powder for

9  the treatment of adult patients with Type 1 and Type 2 diabetes for the control of

10 hyperglycemia, a rapid-acting insulin that had completed clinical trials for the

11 treatment of diabetes in the United States, Europe, and Japan.  AFREZZA utilizes

12 Technosphere formulation technology, which is based on a class of organic molecules

13 that are designed to self-assemble into small particles onto which drug molecules can

14 be loaded.  With AFREZZA, the Company loads recombinant human insulin onto the

15 Technosphere particles.

16 23.  A prior inhaled insulin formulation, Exubera, had been approved but had

17 not been successful.  Pfizer, Inc. had invested $2.8 billion in Exubera but it was not

18 widely accepted due to the awkward nature of the inhaler.  Due to the inconvenience,

19 both doctors and patients were not enthusiastic and Pfizer ultimately pulled Exubera

20 from the market.  AFREZZA was considered more convenient than Exubera.  Thus,

21 assuming it was approved, MannKind was able to generate substantial investor

22 enthusiasm for the product.

23 24.  On March 16, 2009, MannKind issued a press release announcing that it

24 had submitted an NDA to the FDA for approval of then-called "AFRESA® (insulin

25 monomer human [rDNA origin]) Inhalation Powder and the AFRESA® Inhaler for

26 the treatment of adults with type 1 or type 2 diabetes mellitus for the control of

27 hyperglycemia."  The Company's NDA was based on a clinical program involving 44

28

1    completed studies and five ongoing studies upon its submission to the FDA.  The

2    release stated in part:

3              "We are delighted to have reached this important milestone," said

4              Alfred Mann, Chairman and Chief Executive Officer of MannKind

5              Corporation. "This NDA submission is the culmination of years of

6              clinical research that has supported our long-held belief that AFRESA

7              will be a first-in-class ultra rapid-acting insulin with the potential to

8              change the way diabetes is treated."

9              25.    In January 2010, prior to the Class Period, the FDA had delayed approval

10   of AFREZZA.  MannKind had represented the delay was due to the FDA's mistake in

11   not completing an inspection of the European facility that makes the insulin used in

12   AFREZZA.  In fact, there were questions about the clinical utility of AFREZZA.

13             26.    On June 9, 2010, defendant Pfeffer appeared at the Needham & Company

14   Healthcare Conference and stated the following:

15             Overall safety, I think this is becoming less of a story as time goes on

16             and as people start to understand the product and it doesn't have some of

17             the issues that were hypothecated for a predecessor product, but it has

18             been very extensively studied, *we don't have safety issues*.

19                         *       *       *

20             We do have – that we talked about earlier, a small non-progressive

21             and clinically insignificant change in pulmonary function. But we offset

22             these with other benefits like reduction in hypoglycemic risk. We have

23             demonstrated no increase in cardiovascular risk, this has been very

24             important in diabetes products, and has been a hang-up for some, not so

25             much because they have a cardiovascular risk, but more often they didn't

26             have a big enough study to demonstrate that they didn't and the FDA

27             started requiring this a couple of years ago. Happily our studies were

28             large enough that we could show essentially no risk whatsoever.

- 6 -

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

27.     On June 24, 2010, the Company issued a press release announcing that the "American Diabetes Association/The Lancet Symposium Will Highlight Study Showing AFREZZA® Provides Comparable Glycemic Control with Less Weight Gain and Hypoglycemia than Standard of Care."  The release stated:

> "We are honored that the ADA and *TheLancet* chose to spotlight AFREZZA data at this special symposium," said Dr. Peter Richardson, MRCP, Corporate Vice President and Chief Scientific Officer, MannKind Corporation.  "Their recognition validates our enthusiasm for AFREZZA's potential to be an important new therapeutic option in the management of diabetes."

28.     Following this release, defendants Richardson and Mann participated in the Wells Fargo Securities Healthcare Conference on June 24, 2010.  During the conference, defendants stated the following:

> [RICHARDSON:] But in terms of where we are with the response to the Complete Response letter, there were three areas which I think we've shared very clearly in terms of that. One was the question of clinical utility, and we all had a question in terms of exactly what was meant by clinical utility. I think when we substitute that, indeed I talked in terms of some other unusual phase to the use in terms of – especially when discussing something such as insulin, we know it's got established efficacy. We know that we have demonstrated in two placebo-controlled studies that we have differentiation from that. ***So the question of efficacy really isn't there***.

> \*          \*          \*

> The clinical utility question I think has really been very much helped by [Study] 117 and also by the discussion that we had.

- 7 -

1    Bioequivalence very clearly demonstrates now in an assay that needs
2    exactly those requirements and also at the moment what we've done is
3    we're actually showing they are the same. And we also have a very good
4    understanding of how to take that data set and move it to the device
5    which I think it really means benefits to the patients in obvious ways,
6    improves on what we already have and that's the dialogue that we're
7    now in.

8                          *       *       *

9        [ANALYST:]   And I take it from – given the fact that you hadn't
10   really put out a separate press release about the FDA meeting that there
11   wasn't anything that was unexpected like additional clinical studies or
12   anything out of the extraordinary that came out of that meeting?

13       [MANN:]   *The meeting was very – seemed to be very*
14   *supportive*. I wasn't there, but the reports from our team – Peter should
15   really answer this, he was at the meeting, but it was a very good meeting.
16   Peter?

17       [RICHARDSON:]   Yeah, I think, I'm the only person in the room
18   that was present at the meeting. *And I would describe it as a very*
19   *productive meeting*. To me the questions have been those which we've
20   describe[d] in terms of clinical utility and bioequivalence and the
21   technical challenge in making that transference. We clearly, really saw
22   great understanding of where we were with the dataset in terms of
23   discussions around clinical utility, understanding what that was and a
24   discussion around 117 in terms of the importance of the bioequivalence.
25   Again, being able to reach agreement and say well, yes we're doing the
26   assays your way and our way always makes a much easier discussion.

27                          *       *       *

28

Well actually, referring to . . . something that Al said earlier on is that, when people have a clear understanding of the pharmacokinetics and the pharmacodynamics of our products, then the comparison to an Exubera or other inhalable type of products really ends there. So I'd have to say that while there is an understanding from the partnership discussions that we've had, that, yes there is an educational phase of the introduction of this product, it's not just a pill that you swallow and suddenly it happens. People need to understand the benefits and how to use the product, but I'm very confident and particularly based on the results that we've seen from the discussions with the FDA now on June 9, in terms of a very strong label particularly in regards to weight neutrality, lack of hypoglycemia that's exciting partners and we see that as a very, very strong label. So I would say with a good understanding of the product, we'd certainly overcome some of those initial perceptions.

*     *     *

[MANN:]   By the way, the perception, if you look at serious market surveys done by professionals, we don't see the problem as being very significant. The trial or the survey we did last year came out about 25% of American physicians, both about evenly split between PCPs and endos. About 25% would recommend this product for their patients. And they showed that within 12 months over 90% of the patient population would be recommended for this product. Just yesterday there was a publication by one of the investment banking firms and analysts who surveyed 100 patients and got a 15% interest in the product. And I might add that the trial – this study we did last year, we also did studies in the five major European markets and found comparable or even better results in most of the countries.

29.   On June 26, 2010, MannKind issued a press release announcing that data on AFREZZA was presented at the American Diabetes Association's 70th Scientific Sessions.   The release stated in part:

> "The proper control of endogenous blood sugar after meals is crucial to the successful management of patients with Type 2 diabetes, and our findings show that AFREZZA achieves this goal more rapidly than standard therapy with insulin lispro," said Dr. Peter Richardson, MRCP, Corporate Vice President and Chief Scientific Officer, MannKind Corporation.   "Additionally, the finding that the effect of AFREZZA on free fatty acids and glucagon was dose-dependent may be very important in understanding the consistent effect that we see with AFREZZA on fasting glucose levels. Free fatty acids play a major role in the pathophysiology of insulin resistance, and we anticipate conducting further research in this area."
>
> *     *     *
>
> AFREZZA™ is a novel, ultra rapid acting mealtime insulin therapy being developed by MannKind Corporation for the treatment of adult patients with Type 1 and Type 2 diabetes for the control of hyperglycemia. It is a drug-device combination product, consisting of AFREZZA Inhalation Powder pre-metered into single use dose cartridges and the light, discreet and easy-to-use AFREZZA Inhaler. Administered at the start of a meal, AFREZZA dissolves immediately upon inhalation and delivers insulin quickly to the blood stream. Peak insulin levels are achieved within 12 to 14 minutes of administration, mimicking the release of meal-time insulin observed in healthy individuals. To date, the AFREZZA clinical program has involved more than 50 different studies and over 5,000 adult patients.

*Study Design and Key Findings*

Single doses of 60U and 90U AFREZZA were compared with 10 IU subcutaneous lispro insulin in an open-label, two-way crossover study incorporating a meal challenge (BoostPlus® 12 fl oz enriched with [U-13C]glucose) in insulin-treated subjects with Type 2 diabetes and normal pulmonary function.

30.     On July 20, 2010, MannKind issued a press release announcing that the FDA had accepted the Company's resubmission of its NDA for AFREZZA, classifying it as a Class 2 resubmission.  The action date set by the FDA would be December 29, 2010.  The release stated in part:

"We have worked diligently since March to prepare our resubmission and we are confident that we have addressed the requests that were outlined by the FDA," said Alfred Mann, Chairman and Chief Executive Officer.  "We will continue to work closely with the FDA during this final stage of the review process. We firmly believe AFREZZA has the potential to address a poorly-met need in diabetes therapy.  Our primary goal is to make this novel therapeutic option available to patients as soon as possible."

31.     On August 2, 2010, MannKind issued a press release announcing its second quarter 2010 financial results.  The release stated in part:

For the second quarter of 2010 total operating expenses were $37.4 million, compared to $53.4 million for the second quarter of 2009, a decrease of $16.0 million. Research and development (R&D) expenses were $26.2 million for the second quarter of 2010 compared to $39.8 million for the same quarter in 2009, a decrease of $13.7 million. This 34% decrease in R&D expense was primarily due to reduced costs associated with the clinical development of AFREZZA(TM) after the submission of its NDA in March 2009.

1                                  *      *      *

2          "The second quarter was particularly busy, as we prepared for our

3      meeting with the FDA and then submitted our response to the agency's

4      Complete Response letter of March 2010," said Alfred Mann, Chairman

5      and Chief Executive Office of MannKind Corporation. "With a Class 2

6      designation for this resubmission, our focus for the next six months will

7      be to work closely with the FDA as it evaluates our next-generation

8      delivery system and the other information that we provided in our

9      resubmission. In the coming months, we will also initiate the installation

10     and validation of equipment for the new device in our Danbury,

11     Connecticut manufacturing facility. Everyone at MannKind is committed

12     to the goal of making AFREZZA available to patients as soon as

13     possible."

14     32.    Following the release, MannKind hosted a conference call for analysts,

15 investors and media representatives, during which defendant Richardson stated the

16 following:

17         To remind you, there were three substantive areas to which the

18     Agency raised questions. Clinical utility, or where does the project and

19     the product fit into the therapeutic complementarian with patients' [sic]

20     with diabetes; the assay methodology used in our studies to demonstrate

21     the bioequivalence of the inhaler used in our pivotal clinical studies and

22     that to be marketed; and finally, the technical aspects of the requirements

23     of the device such as how often is it changed and how we mark the

24     amount of [inaudible] identify each cartridge.

25         As we indicated to you in our previous updates, we are confident

26     that we will be able to test these on the basis of the data we already had

27     available, or were in the process of generating as part of our previously

28

agreed development of our next-generation device, formerly known internally as Dreamboat.

We were able to have a very helpful and productive discussion in the meeting with the Agency on June 9, during which we were able to establish . . . what data would be sufficient for them to resume the review based upon the additional clinical data from Study 117.

\*       \*       \*

I am delighted with my team's performance in responding so rapidly to the questions and feel that we have a strong set of answers. Furthermore, I'm pleased that we're now on course for launch with [a] next-generation device which offers such significant benefits. The new device and the studies are able to address the technical aspects of the complete response. It's clear that this evolution is the optimal approach of bringing [AFREZZA] to market in the most effective way and the shortest possible timeframe. In order to do this we have in essence simplified the old device to its very basics and have not changed in any way the powder formulation or the amount of fine particles absorbed.

33.   On August 19, 2010, MannKind announced pricing of a secondary offering of $100 million aggregate principal amount of Senior Convertible Notes. The Company expected to use the net proceeds of the offering in order to fund costs of its clinical trials programs and other research and development activities, to expand its manufacturing operations, both on-going and planned, and for general corporate purposes, including working capital.

34.   On September 13, 2010, defendants attended the Morgan Stanley Global Healthcare Conference call for analysts, media representatives and investors, during which Mann represented the following:

Well, we've done extensive preclinical studies over 50 trials in over 5,000 patients, some of the patients have been on our therapy for

1    over 5 years. At the end of the day, we have seen absolutely no impact
2    on lung tissue. We've seen no increase in risk of cardiovascular
3    problems or of cancer and there have been no safety signals. The FDA
4    has raised not a single safety concern related to AFREZZA. Now all that
5    said, at the end of the day, we really truly believe that AFREZZA is very
6    safe, actually reduces the risk of . . . short-term safety because you don't
7    have the extent of hypoglycemia that you have with other drugs. And we
8    believe you'll be able to get fasting levels down to a point where you get
9    better A1cs to lower long-term safety concerns as well and we see no
10   other issues evolve. We have no safety signals of any kind.

11   35.    On September 14, 2010, defendant Edstrom appeared at the Robert W.
12   Baird & Co., Inc. Health Care Conference and represented the following:

13   So AFREZZA, we call it the next-generation insulin. So why is it
14   a next-generation insulin? Well, it is for right now at least the first and
15   only ultra-rapid-acting insulin that is up for FDA review with the
16   PDUFA date scheduled for December 29 of this year.

17                          *        *        *

18   In terms of pulmonary functions, we have seen very little effect of
19   pulmonary function, and actually it's probably more a little bit of the
20   reaction to the powder. If it stops it always comes back and the
21   difference is, as one doctor said, . . . basically the difference . . . between
22   pulmonary function [in] an 80-year old and an 81-year old person. So it
23   really is non-significant in terms of effect.

24   Safety, we have studied AFREZZA very extensively from a safety
25   point of view, particularly because it's combined with the FDKP, or the
26   Technosphere, which is a new compound that the FDA had . . . not seen
27   before.

28

36.    On October 29, 2010, MannKind issued a press release announcing its third quarter 2010 financial results.  The release stated in part:

> For the third quarter of 2010 total operating expenses were $42.5 million, compared to $42.8 million for the third quarter of 2009, a decrease of $0.3 million. Research and development (R&D) expenses were $31.4 million for the third quarter of 2010 compared to $30.5 million for the same quarter in 2009, an increase of $0.9 million. This 3% increase in R&D expense was primarily due to increased raw material purchases in the third quarter of 2010 offset by decreased costs associated with the clinical development of AFREZZA® after the submission of its new drug application (NDA) in March 2009.
>
> *        *        *
>
> "During this past quarter we were primarily focusing on preparations for commercial readiness and for an AFREZZA partnership," said Alfred Mann, Chairman and Chief Executive Officer. "In addition, we executed a multi-part strategy in which we added close to $100 million from an offering of convertible notes and put in place a series of equity sales intended to raise additional funds over the next year, provided our stock price exceeds the floor price that we set. Finally, paralleling that transaction we also established a mechanism, which is now being executed, to retire a portion of the debt under The Mann Group loan agreement."

37.    After releasing its third quarter 2010 results on October 29, 2010, MannKind hosted a conference call for analysts, media representatives and investors, during which defendant Mann represented the following:

> We are continuing to work collaboratively with the agency to support their review of our resubmission. Even before approval on a partnership, it is important that we begin planning for commercialization

of the AFREZZA system. MannKind must therefore increase that focus and begin to plan for the launch. ***Our goal is to secure a global partnership with a major company and such discussions with a number of potential partners are moving forward***. However, as Hakan noted, we do not expect to reach closure until after the label is finalized. That said, we cannot comment further on a partnership until it is appropriate to announce a definitive agreement. In the meantime, we are preparing for commercial readiness. The first of the new commercial filling and packaging machines that will be used with the AFREZZA Inhalation system was delivered to our Danbury, Connecticut factory in August.

*     *     *

AFREZZA is well tolerated and ***we've not identified any safety signal***, though we will not recommend it for patients with compromised lung function.

38. On December 28, 2010, MannKind issued a press release announcing that the Company had received notification from the FDA that it was unable to complete the review of the NDA for AFREZZA by the action date of December 29, 2010. The FDA stated it would require an additional four weeks to complete its review.

39. On January 12, 2011, MannKind participated at the JP Morgan Healthcare Conference during which defendant Mann stated:

Our product AFREZZA addresses this market. We think it's a blockbuster or even super blockbuster potential. It's addressing an enormous opportunity and it really addresses the problems with the current insulins very effectively. It's a first in a new class of insulins, which we call ultra-rapid acting insulins. They're delivered through a very convenient easy to use inhalation system.

1          *          *          *

2          We've studied this in an enormous number of trials, over 50 trials,

3     well over 5,000 patients and we've not seen a single safety signal. . . .

4          We do see a very tiny amount of clinically insignificant reduction

5     in pulmonary function. In our trials we saw this, with a new inhaler . . .

6     we see virtually none. The reason for the difference is part of the

7     problem with the old inhalers, there was a few particles of where there

8     was aggregation of the particles and that sort of reached cough center

9     and also people reacted to it. But we're seeing much less, almost no

10    effect on pulmonary function, whatever it was, even before it was non-

11    progressive and after you stop using it, it recovered quickly.

12          *          *          *

13    We got a submission we did in March 16th of 2009. In March 12th of

14    2010, we got a CRL, and we had a meeting with the agency on June 9th

15    of last year, and then we refiled a resubmission in 2010, which was

16    accepted by the agency as a complete response on, and we're expecting

17    the action date on December 29th. On the 27th, they called and said they

18    needed about another four weeks to complete their work. So we're

19    cautiously optimistic, but one never knows, you can never predict the

20    action of the agency.

21          We're moving now towards preparation for launch. We've

22    installed a new equipment for filling and finishing the new cartridge for

23    the new inhaler that was received in August, a very interesting machine.

24    Those of you who really are interested perhaps should go out and visit

25    the factory and see it, see the whole systems. A very fine factory, we –

26    that one of the pharmaceutical manufacturing organizations gives five

27    awards out every summer, and the – for I think the only time they've

28

ever done it they gave two of the awards for us, for our factory, really quite an impressive factory, you ought to take a look at it.

*       *       *

We think it has blockbuster potential with AFREZZA, it's a large and unmet medical need and in an epidemic, is out of control, it's unique technology, it's a whole new class of insulin that addresses the issues with other insulins and will frankly provide better therapy in my opinion than most of the other oral drugs and other alternative therapies that are there and they are only really there because . . . current insulins are not adequate, mostly prandial insulins, I should say. It's an easy system to use very simple and we expect approval soon and certainly FDA action.

40.   Following these statements, MannKind's stock increased from $8.71 per share on January 11, 2011 to $9.40 per share by January 13, 2011.

41.   On January 18, 2011, MannKind received notice that the FDA had requested two addditional clinical trials with its inhaler, such that approval would be much later than represented.  MannKind waited until the next day to disclose this notice. Because of this non-disclosure, MannKind's stock traded above $10 per share on January 18, 2011.  Also on January 18, 2011, defendant Pfeffer, the Company's CFO, sold 6,300 shares of his own MannKind stock for $10.00 per share.

42.   Then, on January 19, 2011, shortly before the market closed, MannKind issued a press release entitled "MannKind Corporation Receives Complete Response Letter from the FDA for AFREZZA®," which stated in part:

MannKind Corporation today announced that it has received a complete response letter from the U.S. Food & Drug Administration (FDA) regarding the New Drug Application (NDA) for AFREZZA® (insulin human [rDNA origin]) Inhalation Powder for the treatment of adult patients with type 1 and type 2 diabetes for the control of hyperglycemia.

- 18 -

A complete response letter is issued by the FDA's Center for Drug Evaluation and Research when the review of a file is completed and questions remain that preclude the approval of the NDA in its current form.

The principal issue raised by the FDA concerned the usage of *in vitro* performance data and clinical pharmacology data to bridge MannKind's next-generation inhaler to the phase 3 trials conducted using its MedTone® inhaler. The FDA has requested that MannKind conduct two clinical trials with the next-generation inhaler (one in patients with type 1 diabetes and one in patients with type 2 diabetes), with at least one trial including a treatment group using the MedTone inhaler in order to obtain a head-to-head comparison of the data for the two devices. In the complete response letter, the FDA stated that after an adequate titration of study medication there should be at least twelve weeks of relatively stable insulin dosing at the end of the treatment period.

The FDA has also requested additional information concerning the performance characteristics, usage, handling, shipment and storage of the next-generation device, an update of safety information related to AFREZZA as well as information on proposed user training and changes to the proposed labeling of the device, blister pack, foil wrap and cartons.

"As we reported last fall, we have already begun a series of studies of the next-generation device in patients with type 1 (Affinity 1) and type 2 (Affinity 2) diabetes," said Alfred Mann, Chairman and Chief Executive Officer of MannKind Corporation. "Consistent with the direction we received in the complete response letter, these trials are designed to focus on careful titration of insulin dose and include at least

- 19 -

twelve weeks of stable dosing. We plan to meet with the agency as quickly as possible in order to be confident that these trials, with appropriate modifications to incorporate a comparison to the MedTone device, will suffice in addressing the agency's questions about patient use and robustness of the next-generation device."

43.    One analyst noted: "Unfortunately, MannKind was unable to provide color on timing of trial completion or (US application) resubmission or strategies to continue financing the company with cash only through" last year's third quarter.

44.    Another analyst firm, Hapoalim Securities, noted that:

As expected, the FDA gave Afrezza its second Complete Response Letter in 12 months. MannKind stated that the principal issue raised by the FDA concerned the usage of in vitro performance data and clinical pharmacology data to bridge MannKind's next-generation (Dreamboat) inhaler to the Phase 3 trials conducted using its MedTone inhaler. The FDA has requested that MannKind conduct two clinical trials with Dreamboat (one in patients with type 1 diabetes and one in patients with type 2 diabetes), with at least one trial including a treatment group using the MedTone inhaler in order to obtain a head-to-head comparison of the data for the two devices. In the complete response letter, the FDA stated that after an adequate titration of study medication there should be at least twelve weeks of relatively stable insulin dosing at the end of the treatment period. We think these requests delay Afrezza at least another 18 months, which we think is extremely problematic considering the company only has funding into 3Q11. *We remain unconvinced that the FDA will ever approve the product and reiterate our SELL rating and $1 Price Target.*

45.    On this news, MannKind's stock plunged $2.94 per share to close at $6.17 per share on January 20, 2011, a one-day decline of 32% on volume of over 34 million shares.

46.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company failed to disclose that the FDA had issues with the clinical utility of AFREZZA which might inhibit approval;

(b)    AFREZZA was a riskier product than investors were led to believe and would require additional risk disclosure to patients if approved;

(c)    The reasons for the FDA's earlier delay in approval were not limited to the inspection of the European facility; and

(d)    Given these factors, defendants knew it was highly doubtful that FDA approval would be forthcoming.

47.    As a result of defendants' false statements, MannKind's stock traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 37% from their Class Period high.

**LOSS CAUSATION**

48.    During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MannKind common stock and operated as a fraud or deceit on Class Period purchasers of MannKind common stock by misrepresenting the Company's business and prospects.  Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of MannKind common stock fell precipitously until trading was halted, and then fell the next day when trading resumed as the prior artificial inflation came out of the price.  As a result of their purchases of MannKind common stock

1  during the Class Period, plaintiff and other members of the Class suffered economic

2  loss, *i.e.*, damages, under the federal securities laws.

3  **NO SAFE HARBOR**

4       49.    MannKind's verbal "Safe Harbor" warnings accompanying its oral

5  forward-looking statements ("FLS") issued during the Class Period were ineffective to

6  shield those statements from liability.

7       50.    The defendants are also liable for any false or misleading FLS pleaded

8  because, at the time each FLS was made, the speaker knew the FLS was false or

9  misleading and the FLS was authorized and/or approved by an executive officer of

10  MannKind who knew that the FLS was false.  None of the historic or present tense

11  statements made by defendants were assumptions underlying or relating to any plan,

12  projection or statement of future economic performance, as they were not stated to be

13  such assumptions underlying or relating to any projection or statement of future

14  economic performance when made, nor were any of the projections or forecasts made

15  by defendants expressly related to or stated to be dependent on those historic or

16  present tense statements when made.

17  **CLASS ACTION ALLEGATIONS**

18       51.    Plaintiff brings this action as a class action pursuant to Rule 23 of the

19  Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise

20  acquired MannKind common stock during the Class Period (the "Class").  Excluded

21  from the Class are defendants and their families, the officers and directors of the

22  Company, at all relevant times, members of their immediate families and their legal

23  representatives, heirs, successors or assigns and any entity in which defendants have

24  or had a controlling interest.

25       52.    The members of the Class are so numerous that joinder of all members is

26  impracticable.  The disposition of their claims in a class action will provide substantial

27  benefits to the parties and the Court.  MannKind has nearly 125 million shares of

28  stock outstanding, owned by hundreds if not thousands of persons.

53.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

       (a)    whether the 1934 Act was violated by defendants;

       (b)    whether defendants omitted and/or misrepresented material facts;

       (c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

       (d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

       (e)    whether the price of MannKind common stock was artificially inflated; and

       (f)    the extent of damage sustained by Class members and the appropriate measure of damages.

54.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

55.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

57.    Plaintiff incorporates ¶¶1-56 by reference.

58.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were

1  misleading in that they contained misrepresentations and failed to disclose material

2  facts necessary in order to make the statements made, in light of the circumstances

3  under which they were made, not misleading.

4        59.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

5              (a)    employed devices, schemes and artifices to defraud;

6              (b)    made untrue statements of material facts or omitted to state

7  material facts necessary in order to make the statements made, in light of the

8  circumstances under which they were made, not misleading; or

9              (c)    engaged in acts, practices and a course of business that operated as

10  a fraud or deceit upon plaintiff and others similarly situated in connection with their

11  purchases of MannKind common stock during the Class Period.

12       60.    Plaintiff and the Class have suffered damages in that, in reliance on the

13  integrity of the market, they paid artificially inflated prices for MannKind common

14  stock.  Plaintiff and the Class would not have purchased MannKind common stock at

15  the prices they paid, or at all, if they had been aware that the market price had been

16  artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

17

18

19

20       61.    Plaintiff incorporates ¶¶1-60 by reference.

21       62.    The Individual Defendants acted as controlling persons of MannKind

22  within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the

23  Company, and ownership of MannKind stock, the Individual Defendants had the

24  power and authority to cause MannKind to engage in the wrongful conduct

25  complained of herein.  MannKind controlled the Individual Defendants and all of its

26  employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the

27  1934 Act.

28

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  January 31, 2011

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON

_____
DAVID C. WALTON

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO 80203
Telephone:  303/861-1764
303/395-0393 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Mannkind.doc

- 25 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| MNKD | 18 January, 2011 | 200 | $1987.98 $9.9399/s |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| MNKD | 20 January, 2011 | 200 | $1072.02 $5.3601/sha |

5.      During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30 day of January, 2011 in Winnipeg, Manitoba.

City                    State

(Signature) X _James_

Name & Address:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JUSTIN MUI, Individually and on Behalf of All
Others Similarly Situated,

PLAINTIFF(S)

v.

MANNKIND CORPORATION, ALFRED E. MANN,
HAKAN S. EDSTROM, MATTHEW J. PFEFFER and
PETER C. RICHARDSON,

DEFENDANT(S).

CASE NUMBER

**CV11 0929 GAF SSx**

**SUMMONS**

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, _David C. Walton_____, whose address is
_Robbins Geller, et al., 655 West Broadway, Suite 1900, San Diego, CA  92101_____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated:   JAN 3 1 2011
_____

By:   **CHRISTOPHER POWERS**
_____

Deputy Clerk

(Seal of the Court)

*1181*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
JUSTIN MUI, Individually and on Behalf of All Others Similarly Situated

**DEFENDANTS**
MANNKIND CORPORATION, ALFRED E. MANN, HAKAN S. EDSTROM, MATTHEW J. PFEFFER and PETER C. RICHARDSON

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
David C. Walton (167268)
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900, San Diego, CA 92101  619/231-1058

**Attorneys** (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in this State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for Violation of the Federal Securities Laws 15 U.S.C. §§78j(b) 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **REAL PROPERTY** | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | **IMMIGRATION** | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | | | ☐ 465 Other Immigration Actions | | |

**FOR OFFICE USE ONLY:**   Case Number:

# CV11  0929

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Winnipeg, Canada |

(b)  List the County in this District; California County outside of this District; State, if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c)  List the County in this District; California County outside of this District; State, if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  January 31, 2011

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Gary A. Feess and the assigned discovery Magistrate Judge is Suzanne H. Segal.

The case number on all documents filed with the Court should read as follows:

## CV11- 929 GAF (SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [_] **Southern Division** | [_] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.